**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| BRENDA LOU GAUNT, ) | |
| ) | |
| Plaintiff, ) | **MEMORANDUM OPINION** |
| ) | **AND RECOMMENDATION** |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | 1:07CV714 |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

Plaintiff, Brenda Lou Gaunt, brought this action pursuant to section 205(g) of the Social Security Act, as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for a period of disability and Disability Insurance Benefits under Title II of the Social Security Act (the "Act"). The parties have filed cross-motions for judgment, and the administrative record has been certified to the court for review.

**Procedural History**

Plaintiff filed an application for Disability Insurance Benefits (DIB) on November 14, 2003, alleging a disability onset date of June 13, 1999. Tr. 41. The application was denied initially and upon reconsideration. Tr. 27, 28. Plaintiff requested a hearing de novo before an Administrative Law Judge (ALJ). Tr. 29. Present at the hearing, held on March 19, 2007, were Plaintiff, her attorney, and a vocational expert (VE). See Tr. 326.

By decision dated April 17, 2007, the ALJ determined that Plaintiff was not disabled within the meaning of the Act. Tr. 13. On July 27, 2007, the Appeals Council denied Plaintiff's request for review of the ALJ's decision, Tr. 5, thereby making the ALJ's determination the Commissioner's final decision for purposes of judicial review.

In deciding that Plaintiff is not entitled to benefits, the ALJ made the following findings, which have been adopted by the Commissioner:

> 1.   The claimant last met the insured status requirements of the Social Security Act on December 31, 2004.
>
> 2.   The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 13, 1999, through her date last insured of December 31, 2004, (20 CFR 404.1520(b) and 404.1571 *et seq.*).
>
> 3.   Through the date last insured, the claimant had the following severe impairments:   multi-level degenerative disc disease, degenerative joint disease, chronic obstructive pulmonary disease, and residuals from a motor vehicle accident which have resulted in a chronic pain syndrome (20 CFR 404.1520(c)).  . . .
>
> 4.   Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
>
> 5.   After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform medium work consisting of one or two step tasks, with no work at heights or around hazards, and no constant lifting, pushing or pulling.

Tr. 15-16.

After reviewing Plaintiff's testimony and her medical records, the ALJ found that Plaintiff was unable to perform her past relevant work (restaurant manager) through her date last insured (DLI). Tr. 22. Plaintiff, born on April 19, 1950, was fifty-four years old as of her DLI, regulatorily defined as "closely approaching advanced age." See id. (citing 20 C.F.R. § 404.1563). The ALJ found that Plaintiff had at least a high school education and could communicate in English. He added that transferability of job skills was not an issue in the case.

Utilizing the above factors, together with Plaintiff's residual functional capacity (RFC), the ALJ relied on the testimony of the VE to determine that, from Plaintiff's AOD through her DLI, she "was capable of making a successful adjustment to other work that existed in significant numbers in the national economy." Tr. 23. Accordingly, the ALJ decided that Plaintiff was not under a "disability," as defined in the Act, during the relevant period.

## Analysis

In her brief before the court, Plaintiff argues that the Commissioner's findings are in error because the ALJ erred in his assessments of her physicians' opinions, credibility, and RFC. The Commissioner contends otherwise and urges that substantial evidence supports the determination that Plaintiff was not disabled.

3

Scope of Review

The Act provides that, for "eligible"[1] individuals, benefits shall be available to those who are "under a disability," defined in the Act as the inability:

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months[.]

42 U.S.C. § 423(d)(1)(A).[2]

To facilitate a uniform and efficient processing of disability claims, the Social Security Administration ("SSA"), by regulation, has reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must determine whether the claimant (1) is engaged in substantial gainful activity (SGA), (2) has a severe impairment, (3) has an impairment which equals an illness contained in the Act's listing of impairments, (4) has an impairment which prevents past relevant work, and (5) has an impairment which prevents him from doing any other work. Section 404.1520.

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied.  Richardson v.

---

[1]  Eligibility requirements for DIB are found at 42 U.S.C. § 423(a)(1).

[2]  The regulations applying to this section are contained in the Code of Federal Regulations (C.F.R.) at Title 20, "Employees' Benefits," and all regulatory references will be thereto.

Perales, 402 U.S. 389 (1971); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). Consequently, the Act precludes a de novo review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. See Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (citing Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). Substantial evidence is:

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings, and that this conclusion is rational. Thomas v. Celebrezze, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).

Issues

1. Physicians' Opinions

SSA regulations require that all medical opinions in a case be considered. Section 404.1527(b). All "medical source"[3] opinions, regardless of its giver, are evaluated

---

[3] See section 404.1502.

pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist. 20 C.F.R. § 404.1527 (2005). Courts often accord "greater weight to the testimony of a treating physician" because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant. [Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001)].

Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (footnote omitted).

Dr. Paul Rush was a physician with Scotland Orthopedics. He noted that Plaintiff had experienced chronic low back pain since sustaining a spinal injury in 1999. Tr. 264. He wrote: "She's now unable *in her opinion*, to do [her past relevant work]. She takes narcotics on a fairly regular basis; she has difficulty sleeping; she's unable to do anymore than *limited* housework, no recreational activity allowed by pain." Id. (emphases added).

In his examination. Dr. Rush found that Plaintiff was in no acute distress and had a normal gait. Plaintiff maintained her lower lumbar lordosis, but she had mild scoliosis of the thoracic spine. She suffered no gross motor or sensory deficits. X-rays of Plaintiff's thoracic spine revealed kyphosis[4] and marked degenerative disc changes at multiple areas. Dr. Rush diagnosed Plaintiff with "chronic back pain, status post multiple compression fractures," and opined that, due to Plaintiff's

---

[4]    Kyphosis is either an anteriorly concave or a forward (flexion) curvature of the spine; "the thoracic spine normally has a mild [kyphosis]." Stedman's Medical Dictionary 1036 (28th ed. 2006) [hereinafter, "Stedman's"].

prolonged chronic pain, physical findings, and need for narcotics, "I do not believe she is capable of holding down a job in the present day economy." Id.

As required by the regulations, the ALJ duly assessed Dr. Rush's opinion, explaining that there was no evidence that Dr. Rush had Plaintiff undergo any functional testing. Tr. 21. This visit was the only time that Dr. Rush saw Plaintiff, and he was not her treating orthopedist. The ALJ believed that it was not likely that Dr. Rush was aware of Plaintiff's actual activity level or that she had discussed her functional abilities with a consultative examiner. Finally, the ALJ noted that Dr. Rush provided no support for his opinion that Plaintiff was disabled by her chronic back pain.

Plaintiff objects that Dr. Rush would have had access to her treatment records, but from this court's review, Scotland Orthopedics' medical records do not contain any information on Plaintiff's activities of daily living ("ADLs"). A claimant's ADLs are indicative of the impact that her ailments have on her level of functioning. Cf. Sullivan v. Zebley, 493 U.S. 521, 528 (1990) ("The statute generally defines 'disability' in terms of an individualized, functional inquiry into the effect of medical problems on a person's ability to work." (citation omitted)). A claimant's own statements about her symptoms are not enough to establish disability. Section 404.1529(a). Cf. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) (little weight may be accorded an opinion based mainly on plaintiff's subjective complaints).

7

There is no discussion in Dr. Rush's notes of Plaintiff's limitations except as she relayed them. But as the ALJ discussed, Plaintiff testified that she was able to drive, grocery shop, and do light household chores. Tr. 17. She told the consultative examiner that she did limited cooking and cleaning, sweeping, and light laundry. See Tr. 19. In addition, the records of Plaintiff's treating physicians reveal that she engaged in other activities, such as woodworking and gardening. See, e.g., Tr. 169 (volunteers, took computer classes); 212 ("much time cleaning her house," tutors); 181 (running a lot of errands for others); 185 (taking care of pets); 190 (has new volunteer client, will attend church function); 294 (woodworking); 311 (gardening). Cf. Tr. 165 (increased pain "some" after lifting a 25-pound bag of dog food). Her daughter attested to a fairly wide range of activities, such as filling the bird feeders, baking cookies, taking care of various pets, and keeping a "very meticulous greenhouse." Tr. 67.

Plaintiff argues that Dr. Rush based his opinion on her "prolonged" chronic pain, but "'disability' requires more than mere inability to work without pain." Wall v. Astrue, 561 F.3d 1048, 1068 (10th Cir. 2009) (citing Ray v. Bowen, 865 F.2d 222, 225 (10th Cir. 1989)); Stuckey v. Sullivan, 881 F.2d 506, 509 (7th Cir. 1989); Dumas v. Schweiker, 712 F.2d 1545, 1552 (2nd Cir. 1983). See also Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) ("'As is true in many disability cases, there is no doubt that the claimant is experiencing pain; the real issue is how severe that pain is.'"

8

(citation omitted)).  And "[t]he only fair manner to weigh a subjective complaint of pain is to examine how the pain affects the routine of life."  Mickels v. Shalala, 29 F.3d 918, 921 (4th Cir. 1994).  As reviewed above, the records do not indicate that Plaintiff's pain is so debilitating as to keep her from engaging in gainful activity.

Plaintiff contends that Dr. Rush also based his opinion on her need for narcotics.  Dr. Rush, however, does not explain that Plaintiff apparently took narcotics because she was unable to take nonsteroidal anti-inflammatory drugs ("NSAIDs").  See Tr. 260, 261.  She also took her pain medication sparingly, and only needed it at such times that her pain exceeded five-to-six[5] on a ten-point scale.  Tr. 332.  The medication took her pain down to one-to-two.  Tr. 333.  Cf. Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (if symptoms are, or can be, reasonably controlled by medication, they may not be considered disabling under the Act).  Plaintiff testified that "the most that I think that I've ever taken in one week, 10 to 12 Vicodin."  Tr. 334.  She takes them only two or three times per week, and they last four to six hours.

Also, the extent of an individual's initial injuries and how long ago they occurred may be largely irrelevant.  Thus, *five years* before Dr. Rush's opinion, and within a year after her accident, Plaintiff reported that "slowly she's able to do more

---

[5]  Plaintiff testified that her pain reached this level "every single day," Tr. 332, yet at physical therapy, she placed her baseline pain at only one to three, see Tr. 318.  Further, she said that pain of four to five was "tolerable," and she mostly managed it with home traction and exercise.  Tr. 311.

9

and more," although she was not then at "full activities." Tr. 255. Further, "She does very well as long as she's careful about what she does." Id. Plaintiff exhibited good range of motion of hips, knees, and ankles and good motor strength, and she walked without a limp. At her next appointment, three months later, Plaintiff complained of only occasional severe exacerbations. Tr. 256; see also Tr. 259 (one year later, still has severe pain only intermittently).

Further, there is no indication that Plaintiff saw Dr. Rush more than once. He wrote that he was seeing Plaintiff at the request of a second physician, for the *purpose* of a "disability determination. Tr. 264. The regulations specifically provide that "[w]e will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, *but solely on your need to obtain a report in support of your claim for disability*." Section 404.1502 (emphasis added).

Treating physician opinions, however, are accorded special status. See section 404.1527(d)(2). "Courts typically 'accord greater weight to the testimony of a treating physician because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant.'" Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006) (quoting Johnson, 434 F.3d at 654 (internal citation omitted)). An opinion based on a one-time examination by a non-SSA expert is simply not due such deference. See Social Security Ruling (SSR) 96-2p, 61 Fed.

10

Reg. 34490-01, 34490 (opinions from sources other than "treating sources" (as defined in section 404.1502) can never be entitled to "controlling weight").

Perhaps equally important is the nature of Dr. Rush's opinion. Dr. Rush does not explain how Plaintiff's "prolonged chronic pain," "physical findings," or even "need for narcotics" limit Plaintiff in her performance of SGA. Rather, he opines as to Plaintiff's ability to "hold[] down a job in the present day economy." Tr. 264. This finding, determinative as it is of disability, is reserved solely to the finder of fact; accordingly, even if Dr. Rush *had* been Plaintiff's treating physician, his opinion would not have been due controlling weight. See section 404.1527(e)(2),(3). Hence, the court finds that the ALJ's decision to discount Dr. Rush's opinion is supported by substantial evidence.

Plaintiff next contends that the ALJ erred in his assessment of the opinion of her general practitioner, Dr. Bradford Faulkenberry. Dr. Faulkenberry wrote that Plaintiff's "condition is chronic and permanently disabling as far as her future employment prospective [sic]." Tr. 274. Yet although Dr. Faulkenberry is admittedly Plaintiff's "treating physician," the rule does not mandate that his opinion be given controlling weight. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam). "It is error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with the other substantial evidence in the case record." SSR 96-2p, 61 Fed. Reg. at 34491. See also

11

section 404.1527. Thus, "[by negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). See also Mastro, 270 F.3d at 178 ("Under such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence.").

In his letter, Dr. Faulkenberry supported his opinion by reference to two others, including that of Dr. Willie Edwards, Jr., who, according to Dr. Faulkenberry,[6] opined that surgery would not help Plaintiff. Such an "opinion," however, does nothing to establish that Plaintiff cannot perform SGA. Dr. Faulkenberry also refers to Dr. Rush's opinion that Plaintiff "was unable to hold any gainful employment due to her chronic pain syndrome." Tr. 274. Because the ALJ had already discounted Dr. Rush's opinion, he concluded that Dr. Faulkenberry's opinion, because it was based on Dr. Rush's opinion, was due no more weight than it.

Plaintiff disagrees with this decision, arguing that Dr. Faulkenberry's opinion is based upon his many years of treating her chronic pain and finds support in his medical records. This is not, however, how Dr. Faulkenberry chose to support his

---

[6]    Dr. Edwards actually opined that Plaintiff's continued smoking and pulmonary disease "would preclude any operative intervention." Tr. 266. The doctor added that Plaintiff had no focal neurologic deficits and was taking only 10-12 Vicodin per week. (Plaintiff was able to take up to one Vicodin every 4 hours. See, e.g., Tr. 295, 301.) Further, Plaintiff's x-rays revealed her previous fractures, but no acute or destructive processes. Tr. 266.

opinion in his letter. The ALJ, on the other hand, found further support for his decision in Dr. Faulkenberry's records, namely, the one in which the doctor contemplated referring Plaintiff to Dr. Rush for a disability examination:

> [Plaintiff's] lawyer had contacted me to write a letter, and I did write one[7] stating that I really didn't feel that I could say she was completely disabled *because I really didn't have any of the specialists that had seen her that had indicated that she was disable[d],* and I felt that I'd be stepping beyond my expertise to make that statement. I think they were upset about me doing this, and we spent a long time talking about that, and I just tried to tell them why I was not able to make that recommendation. We decided to send her back to Scotland Orthopedics, to Dr. Rush, to see if he would consider some kind of disability determination, since Dr. Holtznect [sic] is the one who had actually started seeing her for this injury years ago.[8]

Tr. 278 (footnotes, emphasis added).

After the date of this note, itself post-dating her DLI, Plaintiff did not seek treatment of pain until an exacerbation of neck pain in *July 2006* – almost a year and a half later. Not until September 2006, almost nineteen months post-DLI, did Dr. Faulkenberry agree to write the "disabled" opinion, noting that Plaintiff would bring him letters from Drs. Edwards and Rush. Tr. 305. The court thus finds no error in

---

[7]    This letter is not in the transcript.

[8]    Plaintiff had last been to Scotland Orthopedics for treatment of back pain in April 2001 (almost 4 years before Dr. Rush's letter), when Dr. Philip Holznecht referred her to a pain clinic. See Tr. 259. During the relevant period, Plaintiff's last treatment for back pain was physical therapy, which ended in March 2002 (2-1/2 years before her DLI). See Tr. 210. See also SSR 96-7p, 61 Fed. Reg. 34483-01, 34487 (claimant's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints"). One week prior, it was determined that Plaintiff pain was "stabilized and manageable." Tr. 166.

13

the ALJ's reasoning.  Cf. Juszczyk v. Astrue, 542 F.3d 626, 632 (8th Cir. 2008) (an

ALJ may discount or disregard a treating physician's opinion if the treating physician

has offered inconsistent opinions (citing Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir.

2001)).  Moreover, like Dr. Rush's opinion, Dr. Faulkenberry's addresses the ultimate

issue of disability and, consequently, would never be accorded controlling weight.

Cf. SSR 96-2p, 61 Fed. Reg. at 34490 (the only opinions entitled to controlling

weight are those addressing the nature and severity of the claimant's impairments).[9]

2. Credibility

         Plaintiff complains that the ALJ erred in his assessment of Plaintiff's credibility.

"The ALJ is required to make credibility determinations . . . about allegations of pain

or other nonexertional disabilities.  . . .  [S]uch decisions should refer specifically to

the evidence informing the ALJ's conclusion."  Hammond v. Heckler, 765 F.2d 424,

426 (4th Cir. 1985) (citation omitted).  Under Craig, 76 F.3d at 591-96, subjective

complaints are evaluated in two steps.  First, there must be documentation by

_____

[9]    Plaintiff contends that these doctors' opinions "are entitled to controlling weight *in
the absence of substantial contradictory evidence*."  Pl.'s Br. at 5 (emphasis added).
Plaintiff, however, employs an incorrect standard.  The regulation reads:

         If we find that a treating source's opinion on the issue(s) of the nature and
    severity of your impairment(s) is well-supported by medically acceptable
    clinical and laboratory diagnostic techniques and *is not inconsistent with the
    other substantial evidence* in your case record, we will give it controlling
    weight.

Secrtion 404.1527(d)(2) (emphasis added).  The ALJ did not disagree with the doctors'
diagnosis (nature), only that Plaintiff was unable to work because of her impairment. Again,
their opinions on this issue would never be entitled to controlling weight.

14

objective medical evidence of the presence of an underlying impairment that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged.  Not until such underlying impairment is deemed established does the fact finder proceed to the second step:  consideration of the entire record, including objective and subjective evidence, to assess the credibility of the severity of the subjective complaints.  See also section 404.1529(b); SSR 96-7p, 61 Fed. Reg. 34483-01, 34484-85.

In Plaintiff's case, the ALJ's Craig findings were combined in a single statement; he found that Plaintiff had impairments which "could have been reasonably expected to produce [Plaintiff's] alleged symptoms, *but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms* are not entirely credible."  Tr. 20.  Plaintiff complains that, in so finding, the ALJ referred to the paucity of her objective findings, see id., but SSA specifically provides for the ALJ to do so, see SSR 96-7p, 61 Fed. Reg. at 34486 (advising the adjudicator to, inter alia, consider "medical signs and laboratory findings").  See also id. at 34487 ("A report of negative findings from the application of medically acceptable clinical and laboratory diagnostic techniques is one of the many factors that appropriately are to be considered in the overall assessment of credibility.").  In particular, the regulation reads:

> In determining the extent to which your symptoms, such as pain, affect your capacity to perform basic work activities, we consider all of the available evidence described in paragraphs (c)(1) through (c)(3) of this section.  We will consider your statements about the intensity,

15

persistence, and limiting effects of your symptoms, and *we will evaluate your statements in relation to the objective medical evidence and other evidence*, in reaching a conclusion as to whether you are disabled. We will consider whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between your statements and the rest of the evidence, including your history, *the signs and laboratory findings*, and statements by your treating or nontreating source or other persons about how your symptoms affect you. Your symptoms, including pain, will be determined to diminish your capacity for basic work activities to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as *consistent with the objective medical evidence* and other evidence.

Section 404.1529(c)(4) (emphases added).

Of course, the ALJ may not disregard a claimant's statements about the intensity and persistence of his pain "solely because they are not substantiated by objective medical evidence." SSR 96-7p, 61 Fed. Reg. at 34485. The ALJ also discussed Plaintiff's improvement with physical therapy and her list of ADLs. Tr. 17, 19-20. He added that there were records showing full range of motion and full motor strength; suggesting no surgical intervention or even further studies; and placing no restrictions that would keep Plaintiff from engaging in gainful activity. Tr. 20-21.

Plaintiff argues that she went to two pain specialists, and this is one of the factors to consider when assessing credibility.[10] See SSR 96-7p, 61 Fed. Reg. at 34487. But she did not return to Dr. Paul Kuzma at Moore Regional Hospital after

---

[10] Plaintiff contends that she sought treatment for pain at SE Pain Management Services from August 3, 2001, to March 7, 2002, Pl.'s Br. at 9 (citing Tr. 189), but the only caregiver she saw throughout this period was for mental health treatment, see Tr. 182-86; 188-90. Plaintiff's reference to treatment at Moore Regional Hospital is to magnetic resonance images. See Tr. 275-77.

16

he recommended physical therapy and performed one cervical nerve root block. See Tr. 199-203.  Plaintiff afterward underwent surgical evaluation by Dr. William Blau at the University of North Carolina Hospitals ("UNCH") in November 2001. Tr. 159, 171.  She said then that the injection, with physical therapy, had helped.[11]  Tr. 162.

It was felt that surgery would not be helpful.[12]  Tr. 163.  Plaintiff was offered additional injections and referred to UNCH's Dr. Paul Tawney for physical therapy evaluation.  When Plaintiff saw Dr. Tawney, in January 2002, she reported that her back pain was "actually manageable if she does not overdo it."  Tr. 169.  Plaintiff was performing volunteer work and had taken computer classes, but had not pursued vocational rehabilitation.  Tr. 169-70.  Dr. Tawney prescribed physical therapy at Moore Regional Hospital and encouraged Plaintiff to pursue vocational rehabilitation.  Tr. 160.  Cf. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (seeking work and working at a job while applying for benefits, are activities inconsistent with complaints of disabling pain).

---

[11]  The record also says that Plaintiff rated her pain at five on a ten-point scale and used only 2-3 pain pills per week.  Tr. 162.  It reports Plaintiff's daily alcohol use and her involvement in a lawsuit related to her car accident.  Generally, physical therapy and the use of transcutaneous electrical nerve stimulation helped her pain.

[12]  The doctor found no surgical indication because Plaintiff's pain seemed to be unrelated to her spinal fracture.  Tr. 172.  He felt that some of her cervical symptoms might be postural.  Dr. Blau believed that Plaintiff's pain was mechanical, but concluded that there was "clearly a significant myofascial component" to her complaints.  Tr. 171.

17

At Plaintiff's third and final visit to UNCH, she reported that she was exercising daily and that her physical therapy had gone well, although her pain had increased "some" after lifting a twenty-five pound bag of dog food.  Tr. 165.  She denied arm or leg weakness, and had five of five extremity strength.  Tr. 165, 166.  Dr. Tawney diagnosed her with neck and back pain, and advised her to finish physical therapy and pursue general exercise.  Tr. 166.  He wrote that Plaintiff's neck pain apparently responded to traction and massage, and that her back pain was "stabilized and manageable."  Id.

Neither Dr. Kuzma nor the UNCH doctors contemplated surgery, placed restrictions on Plaintiff, or advised her not to work.  In this case, the claimant's treatment at a pain clinic does not bolster her credibility, as these records fail to support allegations of disabling pain.

Plaintiff also cites to her use of powerful pain medication.  But although the "type" of medication taken is a factor to be considered, so are the dosage and effectiveness.  SSR 96-7p, 61 Fed. Reg. at 34485.  In this case, Dr. Faulkenberry prescribed narcotics instead of NSAIDs because of her intolerance, and her own testimony was that she took them infrequently.  Vicodin apparently effectively managed Plaintiff's spinal pain as, after her treatment at the pain clinic, she did not again seek treatment for her pain for a year, at which time she had not taken Vicodin for two weeks.  See Tr. 220.  See also Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (if symptoms are, or can be, reasonably controlled by medication, they

18

may not be considered disabling under the Act).  After Plaintiff's hospitalization for alcohol detoxification in 2003, she did not again seek treatment for spinal pain through her DLI.

Plaintiff complains that the ALJ failed to consider the side effects of her medication.  Plaintiff testified that Vicodin makes her lethargic and slow mentally, Tr. 332, but her records do not reveal that she made this complaint to her caregivers. Further,  "[d]rowsiness often accompanies the taking of medication, and it should not be viewed as disabling unless the record references serious functional limitations." Burns v. Barnhart, 312 F.3d 113, 131 (3d Cir. 2002), cited in Johnson, 434 F.3d at 658.  Plaintiff's records fail to reveal such limitations.

The court agrees with Plaintiff that her ADLs *are* consistent with her pain – just not with her alleged limitations.  Cf. Johnson, 434 F.3d at 658 (noting that pattern of claimant's routine activities, including reading, cooking, performing recommended exercises, doing laundry, and attending church, cleaning house, washing dishes, doing laundry, and visiting, was inconsistent with plaintiff's complaints).  Overall, the court finds that the ALJ's credibility decision is supported by substantial evidence.

3.  RFC

Social Security Ruling 96-4p, 61 Fed. Reg. 34488-01, explains that:

> Once the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the pain or other symptoms alleged has been established on the basis of medical signs and laboratory

findings, allegations about the intensity and persistence of the symptoms must be considered with the objective medical abnormalities, and all other evidence in the case record, in evaluating the functionally limiting effects of the impairment(s).

Id. at 34489.  The ALJ here, of course, determined that Plaintiff's allegations about her symptoms were not due full credibility.  He further noted that Plaintiff engaged in ADLs which belied an inability to perform SGA.  The ALJ also discussed Plaintiff's medical records, which contained minimal objective findings.  As a result, he determined that Plaintiff could perform "medium work consisting of one or two step tasks, with no work at heights or around hazards, and no constant lifting, pushing or pulling."  Tr. 16.

Plaintiff contends that the ALJ failed to address her "non-exertional" impairment of pain.  But "not every nonexertional limitation or malady rises to the level of a nonexertional impairment."  Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989) (citing Grant v. Schweiker, 699 F.2d 189 (4th Cir. 1983)).  The ALJ cited Plaintiff's testimony that she experiences chronic pain and constant pain in her lower and upper back.  Tr. 17.  He noted her alleged limitations because of pain and her pain rating.  The ALJ also talked about measures Plaintiff used to lessen her pain.

In reviewing Plaintiff's records, the ALJ noted reports of improvement after therapy and with medication.  Tr. 17-18.  He described Plaintiff's treatment at UNCH, where her neck pain responded to traction and massage, her back pain had stabilized and was manageable, and her headaches had resolved.  Tr. 19.  The ALJ

20

added that Plaintiff told the consultative psychological examiner that her major complaint was pain.

The ALJ observed, however, that Plaintiff's examinations mostly showed full ranges of motion and full motor strength. Tr. 21. He also noted that, in spite of Plaintiff's complaints, she consulted with pain specialists for only a short period, see pages 17-18, supra, and that was early in the relevant period. The ALJ ultimately concluded that Plaintiff's allegations were "not entirely credible," Tr. 20, and objected that "there are plenty of people who have chronic pain, but who work full-time," Tr. 21. Clearly, the ALJ considered Plaintiff's pain in formulating her RFC, but declined to fully credit her allegations.

Plaintiff further points to her inability to reach, but the ALJ addressed this claim: "There is no mention in the record of any objective evidence showing that the claimant had difficulty with her arms or hands in connection with her back or neck condition and only the consultative physician has mentioned that she had difficulty raising her arms above her head." Tr. 21. Plaintiff's records support this assessment, as they contain no arm or hand complaints to her caregivers or even to the consultant examiners.

> Although the ALJ bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence, we have also stated that a claimant's [RFC] is a medical question. . . . In evaluating a claimant's RFC, the ALJ is not limited to considering medical evidence, but is required to consider at least some supporting evidence from a professional.

21

Masterson v. Barnhart, 363 F.3d 731, 737-38 (8th Cir. 2004).  As Plaintiff has failed to establish an impairment that affects her reaching, the ALJ did not err in failing to find her so impaired.[13]

Plaintiff next refers to "the affects of her depression," Pl.'s Br. at 12, but she does not state what those "affects" are.  She testified that her doctor believes that her medications help to control her mental health symptoms, but she still has "some anxiety."  Tr. 337-38.  Plaintiff described her mental health treatment as confined to a visit every three or four months to have her prescriptions refilled.  Tr. 343.  Plaintiff admitted that stopping alcohol abuse in November 2003 helped her mental health. Tr. 344.

Plaintiff's last mental health record includes her report that her medications "really help her be more stable," although she still experienced some ups and downs.  Tr. 213.  Her psychiatrist rated her symptoms as nonexistent, except for anxiety, which was less than mild.  He assessed her "GAF" at ninety.[14]  Again, Plaintiff has failed to establish a nonexertional impairment that the ALJ should have

---

[13]  At different points, Plaintiff did complain of shoulder pain and of wrist pain, but neither impairment met the duration requirement.  See section 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.  We call this the duration requirement.").

[14]  A Global Assessment of Functioning ("GAF") score represents a clinician's judgment of an individual's overall level of functioning.  American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 2000).  The GAF scale considers psychological, social and occupational functioning of mental health on a scale of 0-100. Id. at 33-34.  The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range.  Lower GAF scores signify more serious symptoms.  A GAF of 90 indicates absent or minimal symptoms.

22

addressed.  <u>Cf.</u> SSR 85-15, 1983-1991 Soc. Sec. Rep. Serv. 343, 345 (West 1992) ("A nonexertional impairment is one which is medically determinable and causes a nonexertional limitation of function or an environmental restriction.").

Nevertheless, the ALJ *did* address Plaintiff's mental health claims.  He discussed her treatment beginning February 1999.  Tr. 18.  The ALJ summarized the findings of the psychiatric consultative examiner, including the test results that showed that Plaintiff "had adequate understanding, reasoning and judgment skills to perform simple, rote activities."  Tr. 19.  The examiner's diagnosis was limited to rule out mood disorder.  Tr. 20.  Based on this evidence, the ALJ limited Plaintiff's RFC to one or two step tasks, Tr. 16, and determined that she could not perform her past *skilled* work, Tr. 22.

Plaintiff lastly points to her nonexertional impairment of bending.[15]  In July 2000, Dr. Holzknecht opined that Plaintiff "would not be able to do *repetitive* lifting, pushing, pulling, bending or climbing."  Tr. 257 (emphasis added).  Not only did the ALJ discuss this opinion, <u>see</u> Tr. 18, he included in Plaintiff's RFC a limitation on lifting, pushing and pulling, Tr. 16, indicating a deliberate choice to delete the

---

[15]  "Bending," as used by SSA, includes "to bend the legs alone (kneel); to bend the spine alone (stoop) or bend both the spine and legs (crouch)," "with crawling as a form of locomotion involving bending."  SSR 85-15, 1983-1991 Soc. Sec. Rep. Serv. at 345, 350. Crouching and stooping are mostly associated with medium, heavy and very heavy jobs. <u>See</u> <u>id.</u> Crawling and kneeling are rare activities in the work world, and limitations on these abilities would be of little significance.  <u>Id.</u>

23

bending and climbing restriction.[16]  The ALJ also noted that, at her orthopedic evaluation in September, Plaintiff complained of increased pain with, inter alia, bending.  Tr. 18.  When Plaintiff sought help at the pain clinic in August 2001, she said that her pain was worse with bending and moving her neck.  Tr. 18.

Interestingly, however, Plaintiff's medical records thereafter contain no complaints associated with bending.  Not even Dr. Rush nor Dr. Faulkenberry mentioned an inability to bend.  As the ALJ stated, by the time Plaintiff attended her physical consultative examination in October 2004, she could bend her knees, her gait was steady, she could stand on her heels and toes, and squat and rise seventy-five percent.  Tr. 20.  In addition, Plaintiff had full range of motion of her neck and lumbar spine.  Although Plaintiff testified that she can no longer shave her legs "in the tub," she added that she was able to do so while on a stool.[17]  Tr. 338. Accordingly, the ALJ committed no error in not addressing Plaintiff's bending allegations.

Even if he had, however, such error would have been harmless.  In meeting the step five burden, the ALJ found that Plaintiff could perform two "light" exertional

---

[16]  This action also supports the thesis that the ALJ did not find that Plaintiff had significant lower extremity limitations.

[17]  Plaintiff also said that she could not cut her toenails, but this would seem to be more a function of her ability to bend her knees (kneel), which the examiner found that she could do.

jobs[18] existing at significant numbers in the national economy, Tr. 23: potato chip sorter (DOT[19] #526.687-010) and "packaging jobs" (DOT #920.685-078), as testified by the VE, <u>see</u> Tr. 345. The first job calls for *no* bending activities. The second, packaging job requires only occasional stooping.[20] The only doctor to place restrictions on Plaintiff, Dr. Holznecht, said only that she should not engage in *repetitive* bending. Consequently, even if Plaintiff was limited in her ability to bend, such restriction would not preclude her from performing these jobs.

Plaintiff next complains that the ALJ erred in that he did not discuss her ability to sustain work activities in an ordinary work setting on a regular and continuing basis. Plaintiff fails, however, to suggest why the ALJ is so required. The court is aware that Ruling 96-8p counsels that, "[i]n assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule)[.]" 61 Fed. Reg. at 34478 (footnote omitted). There is no requirement, however, that the ALJ make "a specific finding that the

---

[18] Using the Medical-Vocational Guidelines as a framework, Plaintiff would be found disabled even if the ALJ had limited her to "light" work. <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 202.13. <u>See also</u> SSR 83-10, 1983-1991 Soc. Sec. Rep. Serv. 24, 28 (West 1992) ("[W]here the criteria of a rule are met, the issue as to the existence of work in the national economy for that individual is resolved.").

[19] The "DOT" (<u>Dictionary of Occupational Titles</u>) is a Labor Department guide to job ability levels that has been approved for use in SSA cases. <u>See</u> section 404.1566(d)(1).

[20] "Occasionally" means "from very little up to one-third of the time." SSR 85-15, 1983-1991 Soc. Sec. Rep. Serv. at 350.

25

claimant can maintain employment." <u>Dunbar v. Barnhart</u>, 330 F.3d 670, 672 (5th Cir. 2003). "Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment."[21]  <u>Frank v. Barnhart</u>  326 F.3d 618, 619 (5th Cir. 2003).

Plaintiff alleges that the ALJ erred in that he failed to "describe the maximum amount of each work related activity [Plaintiff] can perform using the evidence from the record."  Pl.'s Br. at 12.  Again, although Plaintiff does not identify such a requirement, Ruling 96-8p provides that the adjudicator must "describe the maximum amount of each work-related activity the individual can perform *based on the evidence available in the case record*."  61 Fed. Reg. at 34478 (emphasis added).  But it has been held that "[t]his requirement does not require a detailed function-by-function analysis that Claimant urges.  Only if the ALJ found that Claimant's [functional ability] was compromised would the burden of discussion fall on the ALJ." <u>Lewis v. Astrue</u>, 518 F. Supp. 2d 1031, 1043 (N.D. Ill. 2007).  <u>See also Banks v. Asture</u>,  537 F. Supp. 2d 75, 85 (D.D.C. 2008) (finding that SSR 96-8p "does not require written articulation of all seven strength demands").

---

[21]  The court does recognize that there is an exception when the claimant's records suggest that he experiences remissions with an impairment that is generally disabling or symptoms that are intermittently disabling.  <u>See, e.g.</u>, <u>Frank v. Barnhart</u>, 326 F.3d 618, 619 (5th Cir. 2003) (requiring the ALJ to make a specific finding regarding the claimant's ability to maintain employment when "the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms").  Plaintiff's situation here does not match this scenario.

26

This issue apparently has not been addressed in the Fourth Circuit, but in the Ninth Circuit, "Preparing a function-by-function analysis for medical conditions or impairments that the ALJ found neither credible nor supported by the record is unnecessary." Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005) (citing SSR 96-8p). So although the ALJ determines the claimant's RFC "based on the evidence available in the case record," that evidence includes Plaintiff's own description of her pain and limitations, which the ALJ here considered and found not to be fully credible.

Thus, while the ALJ did not explicitly articulate a function-by-function assessment of Plaintiff's ability to perform the numerous work-related tasks, the ALJ's articulation satisfied the requirements of Ruling 96-8p. He did not simply describe the RFC in general terms, but made explicit findings. Admittedly, the court would have preferred that the ALJ had made specific findings as to all functions, but it does not believe that he overlooked them. Instead, the record reflects that the ALJ implicitly found that Plaintiff was not limited in those areas.

Under Ruling 96-8p, an individual's "exertional capacity" addresses "seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling." 61 Fed. Reg. at 34477. The ALJ discussed Plaintiff's testimony that she has had chronic pain since her 1999 car accident which precludes her standing for more than one hour, but that she is comfortable sitting. Tr. 17. Plaintiff added that she could

27

lift a jug of milk. She testified that she drives, grocery shops, and performs light household chores.

The ALJ wrote that, by January 2000, Plaintiff was moving her legs well and benefitting from physical therapy. In April,[22] "she was able to do more and more" and did "'very well as long as she was careful about what she does.'" Id. (quoting Tr. 255). In July, Plaintiff reported intermittent severe exacerbations of her pain, but she moved her legs well and was neurovascularly intact. Tr. 17-18. Her treating orthopedist opined that Plaintiff would not be able to perform repetitive lifting, pushing, pulling, bending, or climbing, and could only stand, walk and sit as tolerated.[23] Tr. 18.

When Plaintiff underwent evaluation in September 2000, she reported persistent ongoing neck and thoracic back pain. Tr. 18. Plaintiff said that her pain was exacerbated by bending, lifting, twisting and turning of her neck or back, or by prolonged sitting or standing, although taking medication helped. The caregiver assessed mechanical back pain, deconditioning of the thoracolumbar spine, and cervical spondylosis. He found no need for additional diagnostic tests, surgical intervention, or a return appointment. The doctor encouraged Plaintiff to be as active as possible, including exercising daily.

---

[22] Although not mentioned by the ALJ, Plaintiff reported in February 2000 that she had been working part-time. Tr. 254.

[23] Plaintiff's records indicate that the orthopedist rendered this opinion in connection with a lawsuit stemming from Plaintiff's accident. See Tr. 258; see also Tr. 157.

28

Fourteen months after her accident, Plaintiff visited a pain clinic, complaining of continuing neck, shoulder and back pain. Tr. 18. The pain increased with bending and moving her neck, but was better with heat, ice and lying on her back. Dr. Kuzma recommended cervical epidural steroids and physical therapy to improve Plaintiff's range of motion. Tr. 19.

Three months later, Plaintiff went to a second pain clinic with an additional complaint of thoracic spine pain. Examination revealed mild, diffuse tenderness and limited flexion and extension, but five of five muscle strength. Again, the assessment included mechanical pain, but with no evidence of radiculopathy. Again, the recommendations were for injections and therapy. By March 2002, Plaintiff's neck pain had responded to traction and massage, her back pain had stabilized and was manageable, and her headaches had resolved. Plaintiff was again advised to engage in exercise. In December 2003, Plaintiff told her psychiatrist that she spent "much time cleaning her house." Tr. 212.

Plaintiff attended a consultative psychological evaluation in October 2004. Tr. 19. Although her major complaint was of chronic pain, she reported that she could drive herself and grocery shopped. Plaintiff could perform limited cooking and cleaning, sweep, and do light laundry. Daily, she did light cleaning, washed dishes, watched television, and read.

In October 2004, Plaintiff also underwent a consultative physical examination. Tr. 20. She stated that she could walk one block; stand one and one-half hours; sit

29

for a couple of hours; lift five pounds; and climb three steps.  Plaintiff said that "she was basically home all day and unable to get out and 'do anything.'"  Id.  She complained of headaches due to neck pain.

The consultant's examination revealed normal strength in all extremities and no joint tenderness.  Plaintiff was able to bend her knees, her gait was steady, and she could stand on her heels and toes and squat and rise seventy-five percent.  Her neck and lumbar spine had full range of motion.  The resulting impressions included history of lumbosacral spine fractures, degenerative disc disease of the cervical spine, and deformity of the T-12 vertebral body with compression deformity of T-8.  The ALJ further summarized the findings of Drs. Rush and Faulkenberry, which are discussed hereinabove.

After this review, the ALJ pointed out that numerous doctors had evaluated Plaintiff, but

> [E]xaminations have consistently shown little in the way of objective findings.  She has reported intermittent exacerbations of her pain, but no doctor has suggested that she was a surgical candidate and at least two of the doctors have told her there was no need for further studies. . . .  Even though [Dr. Holzknecht] placed [work] restrictions on the claimant, he did not suggest that she was totally disabled.  The majority of the examinations have shown that the claimant had full range of motion of her neck and lumbar spine and full motor strength of her lower extremities. . . .  Therefore, based on the totality of the record, *I am persuaded that the claimant retained significant functional abilities* prior to [her DLI].

Tr. 20-21 (emphasis added). The ALJ added that "medium" work "generally requires lifting no more than 50 pounds at a time, with frequent lifting or carrying of objects weighing no more than 25 pounds." Tr. 21-22.

Thus, consistent with Ruling 96-8p, the ALJ discussed the objective medical evidence, Plaintiff's symptoms, the medical source opinions, and other evidence, but found little evidence in the record to suggest Plaintiff was unduly limited in her abilities to sit, stand, and walk. Therefore, the ALJ's RFC analysis was proper, and his finding even less rigorous than that of the state agency expert who *did* perform a function-by-function analysis. See Tr. 118-25. Cf. section 404.1527(f) (state agency consultants and program physicians are experts in SSA disability programs, and fact finders must consider their findings of fact as opinion evidence).

## Conclusion and Recommendation

For the foregoing reasons, the decision of the Commissioner is supported by substantial evidence and the correct legal principles were applied. Therefore, **IT IS RECOMMENDED** that the Commissioner's decision finding no disability be **AFFIRMED**. To this extent, Plaintiff's motion for summary judgment (pleading no. 12) seeking a reversal of the Commissioner's decision should be **DENIED**,

31

Defendant's motion for judgment on the pleadings (pleading no. 15) should be **GRANTED**, and this action should be **DISMISSED** with prejudice.

_____
WALLACE W. DIXON
United States Magistrate Judge

June 12, 2009